**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CONDA M.,**

                **Plaintiff,**

     **v.**                       **Civil Action 2:22-cv-2772**
                                   **Judge Sarah D. Morrison**
                                   **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

                **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Conda M., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

This is Plaintiff's second case before the Court. Plaintiff previously filed her application for DIB on March 1, 2013, alleging disability beginning July 1, 2012. (R. at 94–101). After her application was denied initially and upon reconsideration, Administrative Law Judge Timothy G. Keller ("ALJ Keller") held a hearing on June 11, 2015. (R. at 29–48). Ultimately, ALJ Keller issued a decision denying Plaintiff's application for benefits. (R. at 11–28). The Appeals Council denied Plaintiff's request for review, making ALJ Keller's decision the final decision of the Commissioner. (R. at 1–6).

Next, Plaintiff appealed the final decision of the Commissioner to this Court. *See Conda M. v. Comm'r of Soc. Sec.*, No. 2:16-cv-966 (S.D. Ohio). Upon a Joint Stipulation for Remand, the Court remanded the case to the Commissioner. (R. at 881–83). After the Appeals Council issued

a remand order (R. at 869–74), a hearing was held on April 10, 2018.  (R. at 825–50).  ALJ Keller again denied Plaintiff's application for benefits.  (R. at 891–915).  Plaintiff appealed to the Appeals Council raising a challenge under the Appointments Clause of the Constitution, U.S. Const. Art. II, § 2, cl. 2, in the manner in which the Administrative Law Judge was appointed and this matter was again remanded to the hearing level.  (R. at 916–20).

ALJ Deborah F. Sanders (the "ALJ") held a third hearing (R. at 789–824), and she denied Plaintiff's application for benefits.  (R. at 760–88).  When the Appeals Council denied review, that denial became the final decision of the Commissioner.  (R. at 748–54).

Plaintiff then brought this action.  (Doc. 1).  As required, the Commissioner filed the administrative record, and the matter has been fully briefed.  (Docs. 8, 9, 11, 12).

## A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as well as her statements to the agency:

In March 2013, [Plaintiff] reported that she had lupus, photosensitivity, and joint swelling (Exhibit 5E/2). She reported that she was five feet, once inch tall, and weighed 145 pounds. In August 2014, she reported that she could walk one block at a time, maybe be continually on her feet for 15 minutes, maybe sit for 30 minutes at a time, and lift and carry nothing (Exhibit 11E/3). She reported that she had no strength in her arms or hands.

At the June 11, 2015 Administrative Law Judge hearing, [Plaintiff] testified that she was unable to perform work at any exertional level due to constant, widespread pain, weakness, and fatigue caused by lupus and fibromyalgia. She said that she could barely stand and required assistance with tasks such as bathing and dressing. She said that she could stand for only about two minutes or walk no more than three minutes at a time. She said that her impairments caused joint pain and stiffness, which made it difficult for her to grip and grasp, and she could not wear shoes. She said that, due to photosensitivity, she could not be exposed to sunlight because it caused needlelike pain in her eyes and caused her to break out in painful rashes that were made worse with the heat. She said that she was depressed and anxious, which made it difficult for her to sustain attention and concentration for basic tasks, and that she spent the majority of each day lying on her side in her bed.

At the April 2018 hearing, [Plaintiff] testified that she had impaired concentration and memory, and was unable to drive, attend movies, grocery shop, or attend her

grandchildren's activities. She said that she had to wear soft clothes. She said that she needed to stay out of the sun or she quickly developed lesions all over her body. She said that she had lupus flares once or twice a month that resulted in headaches, irritable bowel syndrome symptoms, painful skin, nausea, fever, and swelling of her joints. She said that she had pain in all her joints and pain with sitting, standing, and walking. She said that she had low energy and napped frequently during the day. At the current hearing, [Plaintiff's] testimony remained generally the same. She indicated that she had suffered from migraines dating back to 1986, noting she had suffered from them all her life. As for her fibromyalgia, she indicated that her condition had gotten worse and her hips and joints would hurt, but Gabapentin let her walk. [Plaintiff] also testified that she was driving at that time.

(R. at 771–72).

## B.   Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records and symptoms related to her mental

health issues during the relevant period:

[Plaintiff] indicated that lupus and the loss of her job and home had precipitated "severe anxiety" and difficulty dealing with her mother, and she reported apprehension, expectant dread, a sinking feeling, nervousness, and extreme fear (Exhibits 7F/2 and 11F/21)[.]. Nonetheless, her mental status examinations indicated that she had good hygiene and was alert and oriented with no impairment of recent or remote memory (Exhibits 7F/3; 12F/75, 233: 13F/4, 15, 26).

In May 2013, [Plaintiff] reported that she lived with her mother, cared for herself, helped her mother with activities of daily living and general household maintenance, managed her own finances, drove a car, had driven to the hearing, and smoked a pack of cigarettes daily (Exhibit 4F). She indicated that she was only a little bit depressed and did not talk about any issues of panic spells or anger problems (Exhibit 4F).

[Plaintiff] underwent a psychological consultative examination with James C. Tanley, Ph.D. in June 2013 (Exhibit 42F). At that time, [Plaintiff] reported feeling depressed, helpless, and worthless. While she indicated she was depressed over her situation, she did not see any mental health professionals or take any psychoactive medication. She reported her daily activities to be getting up at 7:30 in the morning, having coffee with her mom, doing school work until 1, doing dishes and laundry, taking turn cleaning the house, feeding the cats, and grocery shopping once a week with her mom. Upon examination, [Plaintiff] was cooperative, demonstrating no eccentricities of manners, impulsivity, or compulsivity. Grooming was unremarkable and her thoughts were coherent, relevant, and goal-oriented. Affect was appropriate and [Plaintiff] was alert and oriented with intact recent and remote memory noted. Overall, Dr. Tanley indicated that [Plaintiff] had no difficulty

3

understanding the task requirements of her examination and she would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks. [Plaintiff] reported she did "good with people" and she made an unremarkable social presentation in the office setting. She had no reports history of mental or emotional deterioration in response to work exposure an indicated that her mental condition never negatively affected her on the job performance. Though Dr. Tanley indicated that her depression could negatively affect her social functioning to some degree and that it could put her somewhat at risk for trying to deal with workplace pressure, neither of these situations is ultimately observed throughout the evidence. Significant weight is given to his opinions. His examination and the overall evidence discussed herein support no more than mild limitations in any area of functioning. Though he indicated [Plaintiff]'s depression could affect her social functioning or could put her somewhat at risk for dealing with workplace pressure, he did not definitively indicate that she would be functionally limited in either area and the overall evidence does not support that her functioning was ultimately affected in either area.

In January 2014, [Plaintiff] had a normal mood and affect (Exhibit 12F/23). In August 2014, she presented with anxiety (Exhibit 7F/2), but she was in no acute distress on exam, which revealed normal alertness, orientation, and memory (Exhibit 7F/3). Xanax was prescribed (Exhibit 7F/5). A couple of weeks later, she was described as depressed but not anxious, and she had normal memory, attention span, and ability to concentrate (Exhibit 7F/7). Elsewhere, she was noted to be well groomed, appropriately dressed, friendly, cooperative, and calm (Exhibit 11F/21). Anti-anxiety medication was prescribed and [Plaintiff] was reminded of the importance of exercising at least 30 minutes each day and maintaining compliance with medication (11F/25). It was also recommended that she seek treatment through a mental health counseling service (Exhibit 11F/24). In August 2014, [Plaintiff] appeared depressed, but not anxious (Exhibit 7F/7). She reported speaking to her children and grandchildren on a regular basis, which she stated brought her joy and comfort, and she stated that she would like to return to college and get her degree (Exhibit 11F/22). The medical record indicated that she spoke with her daughter and grandchildren regularly, and that she considered them a source of joy and comfort (Exhibit 11F/22). Also in August 2014, [Plaintiff] completed and signed a background questionnaire stating that she lived with her mother, performed household chores with breaks, grocery shopped a little at a time, and, for entertainment or enjoyment, watched television, played with her cat, and watched movies (Exhibit 11E).

In February 2015, [Plaintiff] reported that she resided with and took care of her 77-year-old mother (Exhibit 9F/7). A March 2015 exam revealed that she was in no distress (Exhibit 12F/208) and had a normal mood and affect (Exhibit 12F/209). In April 2015, she had a normal mood, affect, behavior, judgment, and thought content (Exhibit 12F/233). In June 2015, she was alert and oriented and had no unusual anxiety or evidence of depression (Exhibit 24F/106).

4

*** There is no indication that she sought mental health counseling as recommended by her primary care doctor, who had prescribed antianxiety medication (Exhibit 11F/24). In July, August, September, October, and November 2015, and January 2016, which was just after [Plaintiff's] date last insured, she was alert and oriented with no unusual anxiety or evidence of depression (Exhibit 24F/76. 80, 83, 89, 95, 102). In February 2016, she was in no distress on exam, which revealed normal findings, including a normal mood, affect, and behavior (Exhibit 20F/65). The record otherwise documents treatment well after her date last insured. The summarized evidence supports a finding of "mild" limitation to the functional area of understanding, remembering, or applying information; "mild" limitation to the functional area of interacting with others; "mild" limitation to the functional area of concentrating, persisting, or maintaining pace; and "mild" limitation to the functional area of adapting or managing oneself.

Because [Plaintiff's] medically determinable mental impairments caused no more than mild limitation in any of the four functional areas, they were not severe (20 CFR 404.1520a(d)(1)). The undersigned notes that Ohio Division of Disability Determination (DDD) reviewing psychologists Karla Voyten, Ph.D., and Katherine Fernandez, Psy.D., also found no more than mild functional limitations and concluded that [Plaintiff] did not have a severe mental impairment (Exhibits 1A and 3A).

(R. at 767–69).

### C.     The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on December 31, 2015, and did not engage in substantial gainful employment during the period from her alleged onset date of July 1, 2012, through her date last insured of December 31, 2015.  (R. at 766).  The ALJ determined that, through her date last insured, Plaintiff had the following severe impairments: fibromyalgia and headaches.  (*Id.*).  The ALJ further determined that Plaintiff's affective and anxiety-related disorders, considered singly and in combination, did not cause more than minimal limitation in her ability to perform basic mental work activities and were therefore not severe.  (R. at 767).  The ALJ found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment.  (R. at 769–70).

As to Plaintiff's residual functional capacity ("RFC"), through the date last insured, the ALJ

concluded:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that [Plaintiff] can occasionally crouch, kneel, crawl, and climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She would not be able to work in an outdoor environment and must avoid moving machinery and unprotected heights with no more than occasional exposure to extreme heat.

(R. at 771).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 772).

Relying on the vocational expert's testimony, the ALJ found that, through the date last insured, Plaintiff was capable of performing her past relevant work as a cashier, addressing clerk and account clerk. (R. at 779–80). She therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from July 1, 2012, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(f))." (R. at 780).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.   DISCUSSION

In her Statement of Errors, Plaintiff challenges the ALJ's determination that her mental health impairments were not severe and further argues that the RFC should have included mental restrictions.  (Docs. 9, 12).   The Commissioner counters that there is no reversible error in the ALJ's finding that her mental impairments were not severe impairments during the relevant period, and substantial evidence supports the crafted RFC.  (Doc. 11).

At step two, the ALJ must consider whether Plaintiff's alleged impairments constitute "medically determinable" impairments.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).   A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques[,]" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.  Additionally, to be classified as "medically determinable," an impairment must meet the durational requirement, meaning, "it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.  "If an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017).

The finding of at least one severe impairment at step two is merely a threshold inquiry, the satisfaction of which prompts a full investigation into the limitations and restrictions imposed by all the individual's impairments. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). "And when an ALJ considers all of a [Plaintiff]'s impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *10 (S.D. Ohio Mar. 16, 2021) (finding no error despite ALJ's failure to designate plaintiff's neuropathy as a medically determinable or severe impairment where the ALJ discussed plaintiff's neuropathy and considered its impact on plaintiff's ability to work).

Here, the ALJ determined that Plaintiff had two medically determinable impairments through her date last insured and moved on with the analysis. Particularly, she found that Plaintiff had the following severe impairments: fibromyalgia and headaches. (R. at 766). In such a situation, the ultimate inquiry is whether substantial evidence supports the RFC fashioned by the ALJ. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1545(a). An RFC is an "administrative finding," and the final responsibility for determining an individual's RFC is reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *1–2 (July 2, 1996). The Sixth Circuit has explained that "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

At the outset, the Undersigned notes that "[t]he Sixth Circuit has made clear that an ALJ's decision must be read as a whole." *Carpenter v. Comm'r of Soc. Sec.*, No. 2:18-CV-1250, 2019 WL 3315155, at *10 (S.D. Ohio July 24, 2019), *report and recommendation adopted*, No. 2:18-CV-1250, 2019 WL 3753823 (S.D. Ohio Aug. 8, 2019) (considering the ALJ's discussion of Plaintiff's depressive disorder at step two when determining if the RFC is supported). So the ALJ's statements that she considered all symptoms and impairments when crafting the RFC (R. at 771), coupled with her careful evaluation of Plaintiff's mental health impairments at step two (*id.* at 767–69), mean that Plaintiff's allegation that the ALJ disregarded these impairments when crafting the RFC is without merit.

Significantly, the ALJ considered each of the four functional areas of limitation:

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas, known as the paragraph B criteria, are the following: 1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace: and 4) adapting or managing oneself.

Consistent with the following evidence, the [Plaintiff's] mental symptomatology did not result in more than mild functional limitations in the four broad functional areas. The [Plaintiff] indicated that lupus and the loss of her job and home had precipitated "severe anxiety" and difficulty dealing with her mother, and she reported apprehension, expectant dread, a sinking feeling, nervousness, and extreme fear (Exhibits 7F/2 and 11F 21) Nonetheless, her mental status examinations indicated that she had good hygiene and was alert and oriented with no impairment of recent or remote memory (Exhibits 7F/3; 12F/75, 233: and 13F/4, 15, 26).

In May 2013, the [Plaintiff] reported that she lived with her mother, cared for herself, helped her mother with activities of daily living and general household maintenance, managed her own finances, drove a car, had driven to the hearing, and smoked a pack of cigarettes daily (Exhibit 4F). She indicated that she was only a little bit depressed and did not talk about any issues of panic spells or anger problems (Exhibit 4F).

The [Plaintiff] underwent a psychological consultative examination with James C. Tanley, Ph.D. in June 2013 (Exhibit 42F). At that time, the [Plaintiff] reported

feeling depressed, helpless, and worthless. While she indicated she was depressed over her situation, she did not see any mental health professionals or take any psychoactive medication. She reported her daily activities to be getting up at 7:30 in the morning, having coffee with her mom, doing school work until 1, doing dishes and laundry, taking turn cleaning the house, feeding the cats, and grocery shopping once a week with her mom. Upon examination, the [Plaintiff] was cooperative, demonstrating no eccentricities of manners, impulsivity, or compulsivity. Grooming was unremarkable and her thoughts were coherent, relevant, and goal-oriented. Affect was appropriate and the [Plaintiff] was alert and oriented with intact recent and remote memory noted. Overall, Dr. Tanley indicated that the [Plaintiff] had no difficulty understanding the task requirements of her examination and she would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks. The [Plaintiff] reported she did "good with people" and she made an unremarkable social presentation in the office setting. She had no reports history of mental or emotional deterioration in response to work exposure an indicated that her mental condition never negatively affected her on the job performance. Though Dr. Tanley indicated that her depression could negatively affect her social functioning to some degree and that it could put her somewhat at risk for trying to deal with workplace pressure, neither of these situations is ultimately observed throughout the evidence. Significant weight is given to his opinions. His examination and the overall evidence discussed herein support no more than mild limitations in any area of functioning. Though he indicated the [Plaintiff]'s depression could affect her social functioning or could put her somewhat at risk for dealing with workplace pressure, he did not definitively indicate that she would be functionally limited in either area and the overall evidence does not support that her functioning was ultimately affected in either area.

In January 2014, the [Plaintiff] had a normal mood and affect (Exhibit 12F/23). In August 2014, she presented with anxiety (Exhibit 7F/2), but she was in no acute distress on exam, which revealed normal alertness, orientation, and memory (Exhibit 7F/3). Xanax was prescribed (Exhibit 7F/5). A couple of weeks later, she was described as depressed but not anxious, and she had normal memory, attention span, and ability to concentrate (Exhibit 7F/7). Elsewhere, she was noted to be well groomed, appropriately dressed, friendly, cooperative, and calm (Exhibit 11F/21). Anti-anxiety medication was prescribed and the [Plaintiff] was reminded of the importance of exercising at least 30 minutes each day and maintaining compliance with medication (11F/25). It was also recommended that she seek treatment through a mental health counseling service (Exhibit 11F/24). In August 2014, the [Plaintiff] appeared depressed, but not anxious (Exhibit 7F/7). She reported speaking to her children and grandchildren on a regular basis, which she stated brought her joy and comfort, and she stated that she would like to return to college and get her degree (Exhibit 11F/22). The medical record indicated that she spoke with her daughter and grandchildren regularly, and that she considered them a source of joy and comfort (Exhibit 11F/22). Also in August 2014, the [Plaintiff] completed and signed a background questionnaire stating that she lived with her mother, performed household chores with breaks, grocery shopped a little at a time, and, for

entertainment or enjoyment, watched television, played with her cat, and watched movies (Exhibit 11E).

In February 2015, the [Plaintiff] reported that she resided with and took care of her 77-year-old mother (Exhibit 9F/7). A March 2015 exam revealed that she was in no distress (Exhibit 12F/208) and had a normal mood and affect (Exhibit 12F/209). In April 2015, she had a normal mood, affect, behavior, judgment, and thought content (Exhibit 12F/233). In June 2015, she was alert and oriented and had no unusual anxiety or evidence of depression (Exhibit 24F/106).

At the June 2015 hearing, the [Plaintiff] testified that she was completely incapable of independently performing activities of daily living, but she attributed her limitations to physical symptoms. She also said that she was engaged and that her daughter took her to the grocery store where she was able to shop by riding in a motorized cart. She was able to attend to and participate in the three Administrative Law Judge hearing proceedings without apparent distraction by mental health symptoms. There is no indication that she sought mental health counseling as recommended by her primary care doctor, who had prescribed antianxiety medication (Exhibit 11F/24). In July, August, September, October, and November 2015, and January 2016, which was just after the [Plaintiff's] date last insured, she was alert and oriented with no unusual anxiety or evidence of depression (Exhibit 24F/76. 80, 83, 89, 95, 102). In February 2016, she was in no distress on exam, which revealed normal findings, including a normal mood, affect, and behavior (Exhibit 20F/65). The record otherwise documents treatment well after her date last insured.

(R. at 767–69).

Plaintiff argues that because Dr. Tanley, Ms. Tewolde, and state agency psychologists concluded that Plaintiff's mental health impairments were "severe," the ALJ adopted an "inaccurate" RFC. (Doc. 9 at 8). But this is an incomplete summary of the evidence. It is true that Dr. Tanley reported that Plaintiff's depression "could put her somewhat at risk for trying to deal with workplace pressure . . . ." (R. at 2004). But Dr. Tanley also said that "[t]here is no reported history of mental or emotional deterioration in response to work exposure. In fact, the [Plaintiff] said that her mental condition never negatively affected her on the [sic] job performance." (*Id.*). The ALJ rightly underscored that Dr. Tanley "did not definitively indicate that she would be functionally limited in either area[,] and the overall evidence does not support that her functioning

11

was ultimately affected in either area" and ultimately decided that the report was persuasive but did not warrant any functional limitations to Plaintiff's RFC for her mental health impairments.  (R. at 768).

Plaintiff also notes that a state agency psychologist determined her affective disorder was "severe."  (Doc. 9 at 9 (citing R. at 53)).  But this blanket categorization is inconsistent with the state agency psychologists expanded explanation in the report:

> [Plaintiff] had no difficulty understanding tasks, estimated to have low average IQ.  Concentration persistence and pace were unimpaired . . . . She responded to all tasks appropriately and is expected to show little difficulty to tasks of increasing complexity.  She has no history of deterioration in response to work exposure.  Her mental conditions have never negatively affected her on the job.  Psych impairment non severe.

(R. at 53–54).  It appears that the diagnosis of Plaintiff's affective disorders as "severe" was scrivener's error.  The state agency psychologist identifies Plaintiff's mental impairments as "non severe" at two different sections of the report.  (*Id.* at 54–55).  Still more, she opined that Plaintiff had only mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (*Id.* at 53–54).  Additionally, at the reconsideration level, the state agency psychologist affirmed the initial assessment, concluding that Plaintiff's mental health impairments were non severe and that there were "no new allegations or changed psych conditions at the [reconsideration] level."  (*Id.* at 66).  As such, the Undersigned finds that the ALJ did not err in categorizing Plaintiff's mental impairments as not severe.  This determination was supported by substantial evidence and consistent with the state agency psychologists' reports at the initial and reconsideration levels.

Even if this was error, the ALJ found other impairments to be severe, proceeded through the sequential analysis, and considered Plaintiff's impairments when crafting the RFC.  (R. at 771

(considering all Plaintiff's "symptoms" and "medically determinable impairments")). So, says the Commissioner, any error in not labeling Plaintiff's mental impairments as "severe" is of no consequence because the analysis proceeded and the ultimate RFC enjoys substantial support. (Doc. 11 at 4–7). Plaintiff challenges this conclusion by saying that the ALJ altogether disregarded her symptoms of affective disorder when crafting the RFC—and that additional limitations should have been imposed. (Doc. 9 at 8–12). For this argument, Plaintiff appears to rely most heavily on the ALJ's evaluation of Ms. Tewolde's opinion.

Ms. Tewolde opined that Plaintiff "was moderately limited in a number of functional areas such as working in coordination with others, performing and completing work tasks, maintaining attention and concentration, performing at expected production level, processing subjectively information accurately, and tolerating customary work pressures." (Doc. 9 at 11–12 (citing R. at 299–301)). In discussing Ms. Tewolde's medical opinion, the ALJ found:

> Messeret Tewolde, a certified nurse practitioner, indicated mild and moderate mental work-related limitations but opined that the [Plaintiff] would likely have partial or full day unscheduled absences from work occurring five or more days per month and that her condition would likely deteriorate if she were placed under stress of a fulltime job, though she was capable of managing her own funds (Exhibits 9F/2-4; 31F). However, a certified nurse practitioner's medical opinion is not included among the acceptable sources of medical evidence defined in the regulations (20 CFR 404.1527(0). For that reason, information provided by a nurse practitioner does not equal in probative value reports from those sources shown as being acceptable such as licensed psychiatrists and psychologists. Moreover, as summarized in Finding 3 above, the longitudinal record documented generally normal mental functioning through the date last insured, even during instances when mental symptoms were alleged. In making this finding, the undersigned has again looked at the relationship between the [Plaintiff] and the provider. Though Ms. Tewolde was a treating provider, the records indicate that the [Plaintiff] presented specifically for a physical examination for social security, though she had another primary care practitioner (PCP) and was advised to keep only one PCP. As for consistency and supportability, the undersigned finds that the opinions of Ms. Tewolde are not consistent with the record, nor supported by her own evaluation. For example, the check box form indicates that the claimant is likely to have partial or full day unscheduled absences from work occurring five or more days per month due to the diagnosed condition and/or side effects of medication and then says "see attached

dx". The attached diagnoses, however, include lupus, which the records clearly indicate that the claimant does not have. The form appears to be a mental health questionnaire but the assessment directly contradicts the objective evidence I the same exhibit. Accordingly, no significant weight is given to this assessment and, rather, little weight is assigned. For these same reasons, controlling weight is not appropriate here.

(R. at 778).

Because Plaintiff filed her claim before March 27, 2017, the ALJ correctly applied the prior regulations for the evaluation of medical opinions. *See* 20 C.F.R. § 404.1527; (R. at 94–101). Under Social Security Ruling SSR 06-03P, Ms. Tewolde, as a nurse practitioner, is not an "acceptable medical source"; instead, she is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939, at *2. "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id.* Ultimately, an ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Starr v. Comm'r of Soc. Sec.*, No. 2:12-CV-290, 2013 WL 653280, at *5 (S.D. Ohio Feb. 21, 2013).

The ALJ did so here. She explained why she assigned little weight to Ms. Tewolde's opinion: "[T]he longitudinal record documented generally normal mental functioning." (R. at 778), and Ms. Tewolde's opinion consists largely of check-box responses with little narrative explanation for the restrictive opinion (*see* R. at 299–301). Such conclusions without narrative explanations are "weak evidence at best," *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016), and an ALJ is not bound by any conclusory statements from medical professionals, never mind statements without objective support. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). And certainly, where, as here, an ALJ has identified an opinion as unsupported by the evidence of

record, the ALJ need not include all opined limitations in an RFC.  As such, the Court will not disturb the ALJ's well supported determination.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   March 22, 2023                         /s/ Kimberly A. Jolson
                                               KIMBERLY A. JOLSON
                                               UNITED STATES MAGISTRATE JUDGE